## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| 1199SEIU NATIONAL BENEFIT FUND; 1199SEIU GREATER NEW YORK BENEFIT FUND; 1199SEIU NATIONAL BENEFIT FUND FOR HOME CARE WORKERS; 1199SEIU LICENSED PRACTICAL NURSES WELFARE FUND; AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, DISTRICT COUNCIL 47, HEALTH AND WELFARE FUND, on behalf of themselves and all others similarly situated, | Civil Action No. _____ <br><br> **CLASS ACTION** |
|                       Plaintiffs, <br>   vs. <br><br> SANDOZ INC., SANDOZ GROUP AG, SANDOZ AG, and NOVARTIS AG, <br><br>                   Defendants. | |

## COMPLAINT

Plaintiffs 1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, and 1199SEIU Licensed Practical Nurses Welfare Fund (collectively, "1199SEIU Benefit Funds"), and American Federation of State, County and Municipal Employees, District Council 47, Health and Welfare Fund (the "DC 47") (collectively, "Plaintiffs") bring this action on behalf of a class of end-payer plaintiffs ("EPPs") (the "EPP Creditor Class," as defined below) for a judgment that the transfer of assets and incurrence of obligations by Sandoz Inc. ("Sandoz") to Defendants Novartis AG ("Novartis"), Sandoz Group AG, and Sandoz AG constitute voidable transactions under the New Jersey Voidable Transactions Act.

## NATURE OF THE ACTION

1.      Plaintiffs, creditors of Sandoz, bring this action to recover the value of fraudulent transfers that Sandoz made to hinder, delay, and defraud Plaintiffs and similarly situated persons from recovering billions of dollars owed to them because of Sandoz's illegal conduct in pricing generic pharmaceuticals.

2.      This action involves a set of circumstances that are as old as legal liability for money damages: a debtor facing a lawsuit transfers its assets and incurs obligations to a friendly person without receiving equivalent value in return, leaving the debtor insolvent so that the debtor's creditors cannot collect on their claims. For nearly five centuries, the law has provided remedies for creditors against this behavior in the form of fraudulent transfer statutes. Here, Plaintiffs sue under New Jersey's current version of that statute, a statute that applies to fraudulent transfers made by an entity that, like Sandoz, has its chief executive office located in that state. Plaintiffs bring this action in this District because of its liabilities in a multidistrict proceeding pending in this District that Sandoz is attempting to evade.

3.      As alleged below, Plaintiffs represent a proposed class of end payers ("End-Payer Plaintiffs" or "EPPs") who filed complaints against Sandoz and other defendants between 2016 and 2019. Those actions are pending in a consolidated multidistrict proceeding before the Honorable Cynthia M. Rufe, in the U.S. District Court for the Eastern District of Pennsylvania, *In re: Generic Pharmaceuticals Pricing Antitrust Litigation.*, MDL No. 2724 (the "*Generic Drug Antitrust* MDL"). Each EPP complaint alleges injuries arising from Sandoz's unlawful anticompetitive conduct that caused higher prices for generic drugs and unjustly enriched Sandoz ("Sandoz EPP Complaints"). In addition to the EPPs' claims, Sandoz is a defendant in related actions brought by state attorneys general and other plaintiffs.

4.      There is little doubt that EPPs will establish that Sandoz entered into unlawful and anticompetitive agreements concerning at least five drugs at issue ***because Sandoz already has admitted to it*** in a Deferred Prosecution Agreement ("DPA") with the United States Department of Justice ("DOJ"). Co-conspirators of Sandoz have admitted to conspiring with Sandoz. In federal criminal proceedings, a former high-ranking Sandoz executive admitted to participating in a conspiracy to fix generic pharmaceutical prices. Documentary evidence and testimony of numerous witnesses confirm the existence of the conspiracies.

5.      Sandoz is facing huge financial liability in connection with these actions. Sandoz has already paid nearly a billion dollars in criminal penalties and settlements with the U.S. federal government. And those resolutions covered just a small fraction of the drugs at issue in the *Generic Drug Antitrust* MDL and over a shorter time period than at issue in those actions.

6.      Faced with this inescapable civil liability, Sandoz – in cooperation with its parents and affiliates – engaged in a series of transactions designed to put its assets out of reach of its litigation creditors. It is not the first to have attempted such a scheme. *See, e.g., In re Tronox Inc.*, 503 B.R. 239, 249 (Bankr. S.D.N.Y. 2013) ("For the reasons stated hereafter, the Court finds that the Defendants acted with intent to 'hinder and delay' the Debtors' creditors when they transferred out and then spun off the oil and gas assets, and that the transaction, which left the Debtors insolvent and undercapitalized, was not made for reasonably equivalent value."); Richard M. Cieri, Lyle G. Ganske & Heather Lennox, *Breaking Up is Hard to Do: Avoiding the Solvency-Related Pitfalls in Spinoff Transactions*, 54 BUS. LAW. 533 (1999).

7.      For years, the Sandoz organization was a collection of entities through which Novartis operated its global generic pharmaceutical business, with Sandoz as the entity through which it operated that generics business in the United States. As Sandoz sold generic

pharmaceuticals in the United States, its profits, including the illegal profits that arose from the conspiracy alleged in EPPs' complaints, were rolled up to Sandoz's global operations and further consolidated into Novartis's financial results. The result is that while EPPs were injured at the hands of Sandoz, the profits reaped from those injured landed in the hands of Novartis, and the Sandoz spin-off was effectuated to erect a barrier to prevent EPPs from seeking redress for those injuries. Even to this day, Sandoz's revenues from its U.S. sales are transferred up to Sandoz AG, Sandoz Group AG, and the global Sandoz organization, and out of the hands of Sandoz's creditors.

8.      In October 2023, Novartis spun the Sandoz entities off as a standalone generic drug company. To do so, Novartis saddled the Sandoz organization with billions of dollars in debt and, in keeping with the playbook of other attempts to use spin-offs to avoid legal liabilities, transferred that cash to Novartis without adequate consideration. The Sandoz entities also incurred obligations to Novartis to pay hundreds of millions of dollars in connection with transferring information technology systems, manufacturing site infrastructure, and marketing authorizations to disentangle themselves from Novartis, obligations that provided a lack of reasonably equivalent value to Sandoz.

9.      As described in detail below, these transactions (the transfers made and the obligations undertaken) were made with the actual intent to hinder, delay, and defraud Plaintiffs and the other EPPs, were without reasonably equivalent value in exchange and left Sandoz insolvent, with assets that, at a fair valuation, are worth less than the sum of its debts, including the claims of the EPPs as well as substantial damages exposure in connection with opioid, product liability, and patent litigation that Sandoz also faces. The transactions left Sandoz with assets that were (and remain) unreasonably small in relation to its business. In undertaking the

transactions, Sandoz and Novartis intended to incur and believed (or reasonably should have believed) that Sandoz was incurring debts beyond its ability to pay as they came due, including the liability on Plaintiffs' claims and the claims of the other EPPs. Moreover, these transfers were made to Novartis and related entities while Sandoz was insolvent, which Novartis and the related entities knew or had reasonable cause to believe.

10.    In this action, Plaintiffs seek remedies on behalf of themselves and similarly situated creditors of Sandoz, including (1) avoidance of the transfers and obligations to the extent necessary to satisfy their claims against Sandoz; (2) an attachment or other provisional remedy against the assets transferred and other property of the transferees; (3) an injunction against further disposition by Sandoz or the transferees of the assets transferred or of other property; and (4) any other relief the circumstances of this case may require.

## PARTIES

11.    Plaintiffs 1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, and 1199SEIU Licensed Practical Nurses Welfare Fund are jointly administered health and welfare funds (collectively, "1199SEIU Benefit Funds"). The 1199SEIU Benefit Funds are among the largest labor-management funds in the nation, providing comprehensive health benefits to hundreds of thousands of working and retired healthcare industry workers and their families. They provide health and welfare benefits to 400,000 members, retirees, and their families. The 1199SEIU Benefit Funds are plaintiffs and proposed representatives of the EPP classes in the *Generic Drug Antitrust* MDL. The 1199SEIU Benefit Funds are creditors of Sandoz as that term is defined in N.J.S.A. 25:2-21 and are a "present creditor" at the time of the fraudulent transfers alleged here within the meaning of N.J.S.A. 25:2-25 and 25:2-27.

12.    Plaintiff American Federation of State, County and Municipal Employees, District Council 47, Health and Welfare Fund ("DC 47") is an employee welfare benefits fund that provides health benefits to over 10,000 participants and their eligible dependents. It is headquartered in Philadelphia, Pennsylvania. DC 47 is a plaintiff and proposed representative of the EPP classes in the *Generic Drug Antitrust* MDL. DC 47 is a creditor of Sandoz as that term is defined in N.J.S.A. 25:2-21 and was a "present creditor" at the time of the fraudulent transfers alleged here within the meaning of N.J.S.A. 25:2-25 and 25:2-27.

13.    Defendant Sandoz Inc. ("Sandoz") is a Delaware corporation with its chief executive office in Princeton, New Jersey. Sandoz was located in New Jersey when the transfers at issue here were made and when the obligations at issue here were incurred, within the meaning of N.J.S.A. 25:2-35(a)(3) and (b). Sandoz is also registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

14.    Defendant Novartis AG ("Novartis") is a global pharmaceutical company organized and existing under the laws of Switzerland with its principal place of business in Basel, Switzerland.

15.    Defendant Sandoz AG is a company organized and existing under the laws of Switzerland with its principal place of business in Basel, Switzerland.

16.    Defendant Sandoz Group AG is a company organized and existing under the laws of Switzerland with its principal place of business in Basel, Switzerland.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the EPP Creditor Class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the EPP Creditor Class is a citizen of a state different from Defendant Sandoz, a citizen of New Jersey and Delaware, and

Defendants Novartis AG, Sandoz AG, and Sandoz Group AG, which are citizens of a foreign state.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim herein occurred in this District. Specifically, the voidable transfers that are the subject of this Complaint were made to prevent or impede the EPP Creditor Class from recovering on claims against Defendants in multidistrict litigation pending in this District, which arise from injuries suffered by Plaintiffs and other members of the EPP Creditor Class in connection with payments and/or reimbursements they made in this District for drugs impacted by Sandoz's unlawful conspiracies.

19.     This Court has personal jurisdiction over the parties, as Plaintiffs' claims directly arise from Sandoz's status as a defendant in the *Generic Drug Antitrust* MDL and status as creditors of Sandoz. Additionally, Novartis, Sandoz AG, and/or Sandoz Group AG engaged in conduct to funnel the ill-gotten gains of Sandoz at issue in the *Generic Drug Antitrust* MDL to themselves to the detriment of the EPP Creditor Class. In light of its purposeful actions to undermine the claims at issue in this forum, Novartis, Sandoz Group AG, and Sandoz AG "should reasonably anticipate being haled into court" here.

## FACTUAL ALLEGATIONS

### The Underlying Litigation Claims

20.     This case, like other wrongful spin-offs, was designed to evade the payment of litigation liabilities. Plaintiffs and other proposed class members hold a claim against Sandoz in the form of an unliquidated right to payment for damages. By virtue of their claims against Sandoz, Plaintiffs and the proposed class members are creditors of Sandoz within the meaning of N.J.S.A. 25:2-21. Sandoz is liable on these claims. By virtue of this liability, Sandoz is a debtor within the meaning of N.J.S.A. 25:2-21.

21.    As alleged in the complaints in the *Generic Drug Antitrust* MDL, Sandoz and other generic pharmaceutical companies entered into anticompetitive and illegal agreements to raise prices and minimize competition in the generic drug industry for numerous generic drugs beginning at least as early as 2009. The conspiratorial conduct involving Sandoz and other generic drug manufacturers was widespread and criminal in nature. Throughout the conspiracy, these manufacturers communicated with each other to reach agreements to fix generic drug prices.

22.    The Antitrust Division of the U.S. Department of Justice ("DOJ") has criminally charged or entered deferred prosecution agreements ("DPA") with Sandoz and six other generic drug manufacturers.

23.    When it was announced, the $195 million criminal penalty Sandoz agreed to pay was the largest ever imposed by the DOJ for a domestic antitrust case.[1] In its DPA, Sandoz admitted that from March 2013 and continuing until in or about December 2015, Sandoz "engaged in discussions with co-conspirators involved in the production and sale of certain generic drugs that competed with Sandoz products. During these discussions, agreements were reached with co-conspirators to allocate customers, rig bids, and/or stabilize, maintain, and fix the prices of certain generic drugs sold in the United States."[2] Sandoz admitted as part of the DPA that "Sandoz's sales of generic drugs affected by these conspiracies totaled more than $500,000,000." In their respective DPAs, three other generic pharmaceutical companies each admitted to conspiring with Sandoz.

---

[1] U.S. Dep't of Justice, Press Release, *Sandoz Inc. Agrees to Pay a $195 Million Criminal Penalty, the Largest for a Domestic Antitrust Case* (Mar. 2, 2020), https://www.justice.gov/opa/pr/major-generic-pharmaceutical-company-admits-antitrust-crimes

[2] *United States v. Sandoz Inc.*, Crim. 20-CR-111 (E.D. Pa.), Deferred Prosecution Agreement (Mar. 2, 2020), https://www.justice.gov/atr/case-document/file/1256306/download.

24. On October 21, 2021, the DOJ also announced that it had entered into civil settlements with Sandoz and two other companies to resolve alleged violations of the False Claims Act arising from conspiracies to fix the price of various generic drugs.[3] As part of its settlement, Sandoz agreed to pay $185 million. In total, Sandoz agreed to pay the DOJ $380 million for the criminal charges and civil claims involving generic drugs.

25. The DOJ also has pursued criminal sanctions against several individuals for the price-fixing of generic pharmaceuticals, including Armando Kellum, Sandoz Director of Contracts and Pricing, who pleaded guilty to Sherman Act violations.[4] As part of his Plea Agreement, Kellum, who was identified as being "responsible for overseeing pricing and contracts of generic drugs" at Sandoz, admitted to the charges of "participating in a conspiracy to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from in or about March 2013 and continuing until at least June 2015, in violation of the Sherman Act, 15 U.S.C. § 1."[5]

26. In discovery in the *Generic Drug Antitrust* MDL, several former Sandoz employees have testified that the agreements between Sandoz and various competitors went well beyond what Sandoz admitted to in its criminal resolution. Sandoz's potential exposure for the

---

[3] U.S. Dep't of Justice, Press Release, *Pharmaceutical Companies Pay Over $400 Million to Resolve Alleged False Claims Act Liability for Price-Fixing of Generic Drugs* (Oct. 1, 2021), https://www.justice.gov/opa/pr/pharmaceutical-companies-pay-over-400-million-resolve-alleged-false-claims-act-liability

[4] *See* U.S. Dep't of Justice, Press Release, *Former Generic Pharmaceutical Executive Pleads Guilty for Role in Criminal Antitrust Conspiracy*, https://www.justice.gov/opa/pr/former-generic-pharmaceutical-executive-pleads-guilty-role-criminal-antitrust-conspiracy; *United States v. Kellum*, Crim. No. 20-065 (E.D. Pa.), Plea Agreement (Feb. 14, 2020) ("Kellum Plea Agreement"), https://www.justice.gov/d9/case-documents/attachments/2020/02/14/376408.pdf.

[5] Kellum Plea Agreement at 3, ¶ 2.

claims in the *Generic Drug Antitrust* MDL substantially exceeds the $380 million Sandoz has already paid to the DOJ.

27.    Starting in March 2016, EPPs filed a series of class actions against several generic drug manufacturers, including Sandoz, alleging an unlawful conspiracy to fix the prices of various generic drug products. Other complaints were soon filed on behalf of a class of direct purchaser plaintiffs and other plaintiff groups. In 2017, attorneys general filed a complaint against Sandoz and other manufacturers alleging an overarching conspiracy to fix the prices of more than a dozen drugs. These actions and subsequently filed actions were transferred by the Judicial Panel for Multidistrict Litigation to the U.S. District Court for the Eastern District of Pennsylvania as part of the *Generic Drug Antitrust* MDL.

28.    The EPP complaints against Sandoz in the *Generic Drug Antitrust* MDL include allegations involving 77 Sandoz drugs, substantially more than at issue in the DOJ criminal and civil resolutions. Additionally, the EPPs' damage claims against Sandoz run through 2018, three years beyond the allegations Sandoz admitted as part of its criminal resolution.

29.    EPPs estimate that Sandoz pocketed billions of dollars in overcharges from sales of price-fixed drugs that ultimately were paid for by EPPs, *i.e.*, consumers, insurers, private businesses, and state and local governments, through 2018.

***Before the Spin-off, Sandoz and Novartis Operated as an Integrated Company***

30.    Before the October 4, 2023 spin-off, Sandoz was an indirect, wholly owned subsidiary of Novartis through which it operated its generic pharmaceutical business in the United States. Novartis was formed in 1996 by the merger of Ciba-Geigy AG and Sandoz AG. After the merger, the Sandoz name became dormant, with Novartis operating its generic business as Novartis generics. Novartis relaunched its global generics businesses under the Sandoz brand.

31.     Novartis operated its generics business under the revived Sandoz brand through various subsidiary companies, including Sandoz, Sandoz AG, and Sandoz International GmbH, but all these companies acted as a single functioning entity without regard to corporate formalities. For all practical purposes, Novartis treated Sandoz as part of a larger integrated company and exercised control over its actions, including its decisions related to the manufacture and sale of the generic drugs at issue in the *Generic Drug Antitrust* MDL.

32.     Sandoz's revenues and financial success were rolled up into the financial results of Sandoz's global operations, and then further consolidated into Novartis's financial statements with the ultimate objective of transferring value and profits to the Novartis organization as a whole, including the illegal profits that arose from the conspiracy alleged in EPPs' complaints.

### *The Fraudulent Spin-Off*

33.     In August 2022, Novartis announced its intention to "separate Sandoz, its generics and biosimilars division into a new publicly traded standalone company, by way of a 100% spin-off."

34.     Novartis, however, did not disclose the details of the spin-off until nearly a year later, when it issued a Prospectus on August 18, 2023, which subsequently was supplemented twice, on September 5 and 11, 2023. Even after the twice-supplemented Prospectus, many details concerning the Sandoz spin-off have not been publicly disclosed.

35.     Before the spin-off, Sandoz was a direct subsidiary of a Novartis entity named Novartis Finance Corporation. To effect the spin-off, Novartis formed a new entity, Defendant Sandoz Group AG. Defendant Novartis's board appointed the board for Sandoz Group AG. Below that entity in the corporate structure was Defendant Sandoz AG.

36.     In September 2023, Novartis Finance Corporation transferred all shares of Sandoz to Novartis, which then transferred all shares of Sandoz to Sandoz AG.

37.     Novartis's shareholders voted to approve the spin-off on September 15, 2023.

38.     On September 28, 2023, Novartis transferred all shares of Sandoz AG to Sandoz Group AG.

39.     On October 4, 2023, Novartis announced that it had "completed the Spin-off of Sandoz, its Generics and Biosimilars business, through a dividend-in-kind distribution to holders of Novartis shares and American Depositary Receipts (ADRs), with each holder receiving one Sandoz share for every five Novartis shares or one Sandoz ADR for every five Novartis ADRs, held at the close of business on October 3, 2023."[6] This left Sandoz as a direct subsidiary of Defendant Sandoz AG, and an indirect, wholly owned subsidiary of a new, standalone entity, Defendant Sandoz Group AG.

***The Spin-Off Leaves Sandoz Undercapitalized and Unable to Pay Its Creditors***

40.     Novartis loaded the Sandoz organization with $3.75 billion in new debt as part of the spin-off.[7] A substantial amount of this debt was used to funnel $2.7 billion in cash right back to Novartis.[8] At the same time, the spin-off left the newly formed, standalone Sandoz organization without sufficient cash to satisfy its litigation liabilities. According to the Prospectus, as of December 31, 2022, reserves set aside for "product liabilities, governmental investigations and other legal matters" were only $87 million.[9] In 2023, $535 million was added to provisions for legal matters, but a substantial portion of that was accounted for by other

---

[6] Press Release, *Novartis executes Sandoz Spin-off, completing strategic transformation into a leading, focused innovative medicines company* (Oct. 4, 2023), https://www.novartis.com/news/media-releases/novartis-executes-sandoz-spin-completing-strategic-transformation-leading-focused-innovative-medicines-company.

[7] Prospectus at 178.

[8] Prospectus 178, F-51

[9] Prospectus at F-34-F-38.

current liabilities and legal matters, including a $265 million settlement with a class of direct purchaser plaintiffs in the *Generic Drug Antitrust* MDL, left the entire Sandoz organization with only $132 million in reserves.[10]

41.     In addition to the generic drug antitrust litigation, Sandoz entities are also named as defendants in more than 600 complaints filed in multidistrict litigation in the U.S. District Court for the Eastern District of Ohio, as well as approximately 45 others, seeking damages arising out of Sandoz's alleged manufacture, promotion, sale and distribution of opioids. On August 31, 2023, Sandoz entered into a settlement for the opioids litigation.[11] As part of the opioid settlement Sandoz paid $99.5 million into a qualified settlement fund in December 2023.[12] Sandoz also faces liability in product liability litigation and patent litigation.

42.     The Sandoz organization's reserves are woefully inadequate for its liabilities in this case alone, let alone the multitude of other "significant legal proceedings" for which it faces liability. As discussed above, Sandoz has already paid the DOJ $380 million for the criminal charges and civil claims involving the conduct at issue in the *Generic Drug Antitrust* MDL. However, the civil claims in the *Generic Drug Antitrust* MDL involve a substantially more significant number of drugs over a more extended time period.

43.     The financial picture of Sandoz is even more dire than the Sandoz organization as a whole. Sandoz's U.S. operations earned $1.6 billion in revenues in 2023 from net sales to third parties. However, like the previously integrated Novartis organization, the current Sandoz

---

[10] Sandoz 2023 Integrated Annual Report (March 12, 2024) ("Sandoz 2023 Financial Report") at 168, available at
https://prod.cms.sandoz.com/sites/spare53_sandoz_com/files/Media%20Documents/2023-Integrated-Annual-Report.pdf

[11] Novartis 2023 Financial Report at 37.

[12] Sandoz 2023 Financial Report at 165.

organization "is a multinational group of companies" with all its "business and functional activities are managed globally on a vertically integrated basis."[13] The profits of Sandoz are rolled up into the Sandoz organization as a whole.[14] As has been done previously, in the face of this substantial liability, Sandoz continues to funnel cash from operations up through the new standalone Sandoz organization up to Sandoz AG and/or Sandoz Group AG. By siphoning cash from Sandoz, Sandoz Group AG has been able to pad its own bottom line, enabling it to, among other things, propose a $230 million dividend to shareholders.[15]

44.    Despite Sandoz AG and Sandoz Group AG's insistence that Sandoz is an independent entity, the direct purchaser settlement mentioned above, as well as other significant legal liabilities, have been included in—and have had a significant impact on—the financial results of the Sandoz organization as a whole, substantially reducing Sandoz Group's EBITA and net cash flow compared to the prior year.[16] Without the willingness of the Sandoz organization to finance such settlements with the money that Sandoz has previously transferred to its parent companies, Sandoz itself would likely be unable to fund such payments, and other creditors are unlikely to be able to recover based on the assets that remain with the Sandoz U.S.-based subsidiary alone.

---

[13] Sandoz 2023 Financial Report at 147.

[14] Sandoz 2023 Financial Report at 135 ("Sandoz constitutes a legal group of consolidated companies and the financial statements are prepared on a consolidated basis.").

[15] Sandoz 2023 Financial Report at 192.

[16] *See, e.g.*, Sandoz 2023 Financial Report at 125 (reduction in Sandoz Group AG's EBITDA "driven by legal costs" that "included the settlement agreement with the class of direct purchaser plaintiffs in the US multidistrict antitrust litigation"), 126 (reducing in net cash flow for Sandoz Group AG "driven primarily by an increase in net working capital, separation costs, a legal settlement and manufacturing optimization"), 148 (Sandoz Group AG's expenses substantially increased partly due to "higher legal provisions and related costs"), 166 ("The amount of the settlement has been included in the company's 2023 financial results.").

45.     Moreover, as noted above, throughout its illegal price-fixing conspiracy and continuing even today, Sandoz—the nominal defendant in the Generics MDL—has funneled its profits to other Sandoz entities, including Sandoz AG and/or Sandoz Group AG. Those past and continuing transfers of profits—which were effectuated at least in part in an attempt to evade liability to Plaintiffs in the Generics MDL—have served to deplete and continue to deplete the financial wherewithal of Sandoz Inc. and leave it unable to satisfy its outsized liabilities to Plaintiffs.

***The Spin-Off was an Actual Fraudulent Transfer***

46.     The Sandoz Spin-Off was undertaken by all Defendants to hinder, delay, or defraud Plaintiffs and the EPP Creditor Class within the meaning of N.J.S.A. 25:2-25(a)(1). Like other statutes targeting actual fraudulent transfers, New Jersey's Voidable Transaction Act sets forth a list of so-called 'badges of fraud' that a court may consider "[i]n determining [actual] intent" under N.J.S.A. 25:2-25(a)(1). As the reporter for the Uniform Voidable Transactions Act (the uniform act on which the New Jersey Voidable Transactions Act derives) has written, "[F]or centuries courts applying the modern statutes or similar laws have interpreted the reference to 'intent' to minimize or eliminate the significance of the debtor's mental state. Courts have used different tools for that purpose. The so-called 'badges of fraud' are one such tool." Kenneth C. Kettering, The Uniform Voidable Transactions Act; or, the 2014 Amendments to the Uniform Fraudulent Transfer Act, 70 BUS. LAW. 777, 809 (2015).

47.     Four badges of fraud are present here. First, as alleged above, "Before the transfer was made or obligation was incurred, [Sandoz] had been sued or threatened with suit." N.J.S.A. 25:2-26(d). Sandoz also faces liability in product liability litigation and patent litigation.

48.     Second, "[t]he transfer or obligation was to an insider." N.J.S.A. 25:2-26(a). As alleged above and detailed further below, all of the transfers and obligations at issue here were to

insiders. Under the New Jersey Voidable Transactions Act, "insider" includes, for a corporation, "a person in control of the debtor." N.J.S.A. 25:2-22, and "person" includes "business or nonprofit entity" and "public corporation" among others. *Id.*

49.     Third, "[t]he value of the consideration received by [Sandoz] was [NOT] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." N.J.S.A. 25:2-26(h). Pursuant to Sandoz's obligations under the Distribution and Separation Agreement executed in connection with the Sandoz spin-off, Sandoz agreed to indemnify Novartis and each of its directors, officers, managers, members, agents, and employees against liability in connection with the generic drug antitrust claims, as well as opioid litigation in the United States and Canada. On its own, this agreement required Sandoz to assume full liability for generic antitrust claims and on its own is an undertaking of liabilities far in excess of any value that Sandoz received in the spin-off.

50.     Fourth, "[Sandoz] was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred." N.J.S.A. 25:2-26(j). Sandoz was insolvent after the transfers were made and the obligations incurred. Sandoz was already insolvent prior to the spin-off because Novartis operated its generics business as a single functioning entity without regard to corporate formalities. For all practical purposes, Novartis managed Sandoz with the ultimate objective of transferring value and profits to the Novartis organization as a whole, including the illegal profits that arose from the conspiracy alleged in EPPs' complaints. Unlike a typical corporate defendant that would at least retain substantial parts of its ill-gotten gains for payment of antitrust damages, Sandoz was stripped of those illegal profits throughout the price-fixing conspiracy. Sandoz AG and Sandoz Group AG are continuing this practice of extracting any

16

profits from Sandoz's U.S. revenues that would otherwise be available to satisfy Sandoz's creditors.

51.     Sandoz's financial condition is even more precarious following the spin-off. By virtue of its liabilities for the damages at issue here, Sandoz faces the need to pay off the huge debt incurred in the spin-off, to develop systems and manufacturing capability that it did not previously have, all the while still funneling cash from its operations to its new parent, Sandoz AG and then to Sandoz Group AG. Remarkably, Sandoz Group AG has plans to pay hundreds of millions of dollars of dividends to its shareholders.[17] Those dividends will be additional fraudulent transfers because a corporation receives nothing in return, much less reasonably equivalent value.

### The Spin-Off was a Constructive Fraudulent Transfer

52.     Even without regard to Defendants' actual fraudulent intent to hinder, delay, or defraud the EPP Creditor Class, the spin-off constitutes a constructive fraudulent transfer without regard to intent within the meaning of N.J.S.A. 25:2-27.

53.     First, the "transfer[s] made [and] obligations incurred by Sandoz … [were] without receiving a reasonably equivalent value in exchange … and [Sandoz] was … or … became insolvent as a result of the transfer[s] [and] obligation[s]. N.J.S.A. 25:2-27(a).

54.     The transfers that Sandoz made and the obligations that Sandoz incurred in the spin-off were without receiving a reasonably equivalent value.

55.     The transfers that Sandoz made and the obligations that Sandoz incurred in the spin-off also resulted in Sandoz's insolvency.

---

[17] Sandoz 2023 Financial Report at 192.

## CLASS ACTION ALLEGATIONS

56.     Plaintiffs bring this action on their behalf and as a class action under Rules 23(a),

23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive

relief on behalf of the following class (the "EPP Creditor Class" or the "Class"):

> All persons and entities who hold an unliquidated claim against
> Sandoz as a member of one of the proposed Damages Classes
> identified in the Sandoz EPP Complaints in the *Generic Drug
> Antitrust* MDL.

57.     While Plaintiffs do not know the exact number of members of the EPP Creditor

Class, Plaintiffs believe there are thousands of members in the EPP Creditor Class.

58.     Common questions of law and fact exist as to all members of the EPP Creditor

Class, including:

(a)     Whether, in connection with the Sandoz spin-off, Sandoz transferred or

will transfer valuable assets from itself to Novartis, Sandoz Group AG and/or Sandoz

AG;

(b)     Whether, in connection with the Sandoz spin-off, Sandoz incurred

obligations;

(c)     Whether the transfers made and obligations incurred by Sandoz in

connection with the Sandoz spin-off were made and/or incurred with actual intent to

hinder, delay, or defraud Sandoz's creditors, including the EPP Creditor Class;

(d)     Whether the value of the consideration received by Sandoz in connection

with the Sandoz spin-off was not reasonably equivalent to the value of the transfers

and/or the amount of the obligations incurred;

(e)     Whether Sandoz was insolvent or became insolvent as a result of or

shortly after the Sandoz spin-off;

(f)      Whether the remaining assets of Sandoz will be insufficient to satisfy its outstanding liabilities, including the multi-billion-dollar contingent liability based on the EPP Creditor Class's antitrust and related state law claims; and

(g)      Whether Sandoz's transfers and incurrence of obligation to Novartis, Sandoz Group AG, and Sandoz AG are voidable under the New Jersey Voidable Transactions Act to the extent necessary to satisfy the claims of the EPP Creditor Class.

59.      Plaintiffs' claims are typical of the claims of the members of the EPP Creditor Class. Plaintiffs and all members of the EPP Creditor Class are similarly affected by Defendants' wrongful conduct, which has impeded the ability of all members of the EPP Creditor Class to recover billions of dollars owed to them because of Defendants' illegal conduct in pricing generic pharmaceuticals. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the EPP Creditor Class.

60.      Plaintiffs will fairly and adequately protect the interests of the EPP Creditor Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the EPP Creditor Class. Plaintiffs are represented by competent and experienced counsel who have diligently prosecuted claims on behalf of the EPP Creditor Class in the *Generic Drug Antitrust* MDL since 2016.

61.      Prosecuting separate actions by individual members of the EPP Creditor Class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants.

62.      Adjudications with respect to individual members of the EPP Creditor Class would, as a practical matter, be dispositive of the interests of the other members or would substantially impair or impede their ability to protect their interests.

63.    Defendants have acted or refused to act on grounds that apply generally to the EPP Creditor Class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the EPP Creditor Class as a whole.

## CAUSES OF ACTION

### COUNT I

**Actual Fraudulent Conveyance in Violation of the**
**New Jersey Voidable Transactions Act, N.J.S.A. 25:2-25(a)(1)**
**(Against All Defendants)**

64.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

65.    EPPs are Creditors as that term is defined in N.J.S.A. 25:2-21.

66.    The claims asserted by EPPs in the *Generic Drug Antitrust* MDL are Claims as that term is defined in N.J.S.A. 25:2-21.

67.    Sandoz has transferred or will transfer valuable assets from itself to Novartis, Sandoz Group AG, and/or Sandoz AG and incurred substantial obligations in connection with the Sandoz spin-off.

68.    The transfers made and obligations incurred by Sandoz were made or incurred with actual intent to hinder, delay, or defraud Sandoz's creditors, including EPPs, as evidenced by, among other things, the following "badges" of fraud:

    a.    The transfers made and obligations incurred by insiders, including Novartis AG, Sandoz AG, and/or Sandoz Group AG;

    b.    Before the transfer was made or obligation was incurred, Sandoz had been sued by EPPs and other plaintiffs in the *Generic Drug Antitrust* MDL;

     c.     The value of the consideration received by Sandoz was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred; and

     d.     Sandoz was insolvent or became insolvent shortly after the transfer was made or the obligations were incurred because, among other things, it does not have enough capital available to meet its litigation liabilities.

69.     Plaintiffs seek a judicial declaration that Sandoz's transfer of assets to Novartis, Sandoz Group AG, and/or Sandoz AG are voidable under N.J.S.A. 25:2-25(a)(1) to the extent necessary to satisfy EPPs' claims, along with such other equitable relief as may be appropriate.

70.     An actual case or controversy exists between Plaintiffs and Defendants regarding whether Sandoz's transfer of assets to Novartis, Sandoz Group AG, and/or Sandoz AG are voidable under N.J.S.A. 25:2- 25(a)(1) to the extent necessary to satisfy Plaintiffs' claims. Accordingly, the declaratory judgment sought is justiciable.

## COUNT II

### Constructive Fraudulent Conveyance in Violation of the
### New Jersey Voidable Transactions Act, N.J.S.A. 25:2-25(a)(2)
### (Against All Defendants)

71.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

72.     EPPs are Creditors as that term is defined in N.J.S.A. 25:2-21.

73.     The claims asserted by EPPs in the *Generic Drug Antitrust* MDL are Claims as that term is defined in N.J.S.A. 25:2-21.

74.     Sandoz has transferred or will transfer valuable assets from itself to Novartis, Sandoz Group AG, and/or Sandoz AG and incurred substantial obligations in connection with the Sandoz spin-off.

75.    Sandoz has transferred or will transfer such assets without receiving a reasonably equivalent value in exchange, as a result of which the remaining assets of Sandoz will be insufficient to satisfy outstanding liabilities, including the multi-billion-dollar contingent liability based on EPPs' antitrust and related state law claims.

76.    At the time of the transfer, Sandoz was engaged or was about to engage in a business or a transaction for which the remaining assets of Sandoz were unreasonably small in relation to the business or transaction.

77.    At the time of the transfer, Sandoz intended to incur, or believed or reasonably should have believed that Sandoz would incur, debts beyond its ability to pay as they become due.

78.    Plaintiffs seek a judicial declaration that Sandoz's transfer of assets to Novartis, Sandoz Group AG, and/or Sandoz AG are voidable under N.J.S.A. 25:2-25(a)(2) to the extent necessary to satisfy EPPs' claims, along with such other equitable relief as may be appropriate.

79.    An actual case or controversy exists between Plaintiffs and Defendants regarding whether Sandoz's transfer of assets to Novartis, Sandoz Group AG, and/or Sandoz AG are voidable under N.J.S.A. 25:2-25(a)(2) to the extent necessary to satisfy EPPs' claims. Accordingly, the declaratory judgment sought is justiciable.

### COUNT III

**Constructive Fraudulent Conveyance in Violation of the
New Jersey Voidable Transactions Act, N.J.S.A. 25:2-27
(Against All Defendants)**

80.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

81.    EPPs are Creditors as that term is defined in N.J.S.A. 25:2-21.

82.     The claims asserted by EPPs in the *Generic Drug Antitrust* MDL are Claims as that term is defined in N.J.S.A. 25:2-21.

83.     Sandoz has transferred or will transfer valuable assets from itself to Novartis, Sandoz Group AG, and/or Sandoz AG and incurred substantial obligations in connection with the Sandoz spin-off.

84.     The claims asserted by EPPs in the *Generic Drug Antitrust* MDL arose before the transfer was made.

85.     Sandoz has transferred or will transfer such assets without receiving a reasonably equivalent value in exchange, as a result of which the remaining assets of Sandoz will be insufficient to satisfy outstanding liabilities, including the multi-billion-dollar contingent liability based on EPPs' antitrust and related state law claims.

86.     As a result of these transfers, Sandoz will become insolvent.

87.     Plaintiffs seek a judicial declaration that Sandoz's transfer of assets to Novartis AG, Sandoz Group AG, and/or Sandoz AG are voidable under N.J.S.A. 25:2-27 to the extent necessary to satisfy EPPs' claims, along with such other equitable relief as may be appropriate.

88.     An actual case or controversy exists between Plaintiffs and Defendants regarding whether Sandoz's transfer of assets to Novartis AG, Sandoz Group AG, and/or Sandoz AG are voidable under N.J.S.A. 25:2-27 to the extent necessary to satisfy EPPs' claims.  Accordingly, the declaratory judgment sought is justiciable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and judgment as follows:

(a)     Declaring that Sandoz's transfer of assets to Novartis, Sandoz Group AG, and/or Sandoz AG are voidable under the New Jersey Voidable Transactions Act to the extent necessary to satisfy EPPs' claims in the *Generic Drug Antitrust* MDL;

(b)      Declaring that Novartis, Sandoz Group AG, and Sandoz AG remain liable to Plaintiffs for the amount of any judgment they obtain against Sandoz;

(c)      Awarding Plaintiffs their reasonable costs and expenses incurred in this action; and

(d)      Granting such other equitable and further relief as the Court may deem just and proper.

Dated: September 16, 2024                     Respectfully submitted:

*/s/ Roberta D. Liebenberg*
Roberta D. Liebenberg
Paul Costa
Adam J. Pessin
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
215-567-6565
rliebenberg@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

Dan Drachler*
**LIEFF CABRASER HEIMANN &
BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco CA 94111-3359
415-956-1000
ddrachler@lchb.com

William J. Leonard
**OBERMAYER REBMANN MAXWELL
& HIPPEL LLP**
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102-2101
(215) 665-3228
William.Leonard@obermayer.com

Joshua D. Snyder
John E. Sindoni
**BONI, ZACK & SNYDER LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
(610) 822-0200
jsnyder@bonizack.com
jsindoni@bonizack.com

Deborah R. Willig
**WILLIG, WILLIAMS & DAVIDSON**
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103
Telephone: 215-656-3666; F: 215-561-5135
dwillig@wwdlaw.com

*Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiffs and the Class*